WALKER, Respondent, vs. VILLAGE OF ONTARIO, Appellant.

*May 30—July 3, 1903.*

*Bridges: Traction engines: Negligence: Personal injuries: Instructions to jury: Ordinary care: Contributory negligence: Evidence: Excessive damages.*

1. In an action for injuries caused by the falling .of a bridge while plaintiff was attempting to pass over it with a traction engine,. in instructions to the jury on the question of ordinary care on the part of defendant, it is not error to call to the jury's attention that what would be ordinary care in discovering the insufficiency of bridges before the use of traction engines,. might not be ordinary care when it was known that traction engines, many tons in weight, frequently passed over them. under the sanction of express law.

2. In an action against a town for injuries caused by the breaking of a bridge while plaintiff was attempting to pass over it with a traction engine, it was insisted that the evidence showed that the breaking down of the bridge was caused by ,the engine-running off the insufficient plank track. It appeared that plaintiff failed to comply with ch. 197, Laws of 1899 (requiring the operator of a traction engine before crossing a bridge or culvert to span it with planks of designated dimensions); that all the six eye-witnesses of the accident testified that the engine did not leave the planks while crossing the bridge, except one who was not asked such question, and no witness testified that the engine left the planks. There was testimony, introduced as impeaching evidence, to the effect that on the afternoon of the day of the accident the engineer told the witness the engine ran off the planks, and at the same time showed witness a plank, lying at the south end of the bridge,. which had on it a mark of an engine wheel. This testimony was denied by the engineer, and was not shown to have been so closely connected with the accident as to be a part of the *res gestæ. Held,* while the mark on the plank might be properly considered as affirmative evidence, it did not rise to the dignity of a *scintilla* of proof that the engine ran off the plank before the bridge broke down, and hence was insufficient to put that fact in controversy.

3. In such case the evidence considered, and *held* to demonstrate absence of causal relation between the failure to comply with

the statute in planking the bridge and the breaking down of the bridge, and to relieve plaintiff of any charge of contributory negligence.

4. In an action against a town for injuries caused by the breaking of a bridge while plaintiff was attempting to pass over with a traction engine, pieces of the bridge were admitted in evidence to show its condition at the time it broke down. It appeared that the wreckage from the bridge was piled in a mill yard where it remained exposed to the weather from August to the following June, when pieces were sawed off and introduced in evidence on a former trial, and that after the trial they were kept in a dark dry room until the instant trial. There was testimony by witnesses who saw the timber after the accident, to the effect that the pieces introduced in evidence appeared to be in about the same condition as when the bridge broke down, except that they were a little more decayed. *Held*, that the pieces of the bridge were properly received in evidence.

5. In an action against a town for injuries caused by the breaking of a bridge while plaintiff was attempting to cross over with a traction engine, an instruction to the jury, in substance, that it was plaintiff's duty to exercise ordinary care; that ordinary care in the instant case would be such as was suitable to or commensurate with the risk which would naturally attend such circumstances of crossing the bridge, and that it was fair to say that plaintiff should exercise a higher degree of care, in order to constitute ordinary care, than he would be required to exercise in going over with an ordinary load, is *held* to cover a requested instruction, in substance, that the care required to be used by a traveler in passing along a highway is measured by the perils obviously to be encountered; that knowledge of the possible insecurity of the bridge, and that the load to be put on it was unusual in weight, should be imputed to plaintiff, and that the plaintiff could not assume that the bridge would safely bear up a traction engine, because it had for many years safely stood the test of ordinary wagon travel over it.

6. A strong and vigorous man was injured by being pinned beneath the wheels of a traction engine when it broke through a bridge and fell a distance of eight feet, and was only released by raising the engine with jackscrews. One leg was crippled so that he was obliged to walk with a crutch or cane, and there was expert testimony tending to prove the injury permanent. *Held*, that a verdict of $2,800 was not excessive.

APPEAL from a judgment of the circuit court for Vernon county: J. J. FRUIT, Circuit Judge. *Affirmed.*

This is an action to recover for personal injuries sustained by the plaintiff while crossing a small wooden bridge in the defendant town with a traction engine on the forenoon of August 26, 1899. The bridge in question was twenty feet in length from one abutment to the other, and was constructed on wooden stringers, eight inches square and twenty-four feet in length, on each side, which reached two feet over the abutment at each end, and were supported by "A" braces, made of timber of the same size tenoned into the stringers over the abutment, and reaching to the apex five feet above the stringers, from which apex a king bolt went down through the stringers and through the floor beam below the stringers. The floor beam reached across the bridge from stringer to stringer, and supported the joists of the bridge, which reached from the abutment on either end to the floor beam. On the day in question the plaintiff was employed as steersman on the traction engine in question, and was riding on it across the bridge in company with one Ritske, one of the owners of the engine, and the engineer. When the engine reached a point about the middle, or a little past the middle, of the bridge, the ends of the braces flew up on one side, the stringers broke, and the engine was precipitated, a distance of about eight feet, into the water below, and the plaintiff was quite severely injured.

The following special verdict was rendered by the jury:

"1. Was there an insufficiency or want of repair in the bridge in question which caused the plaintiff's injury? *A.* Yes. 2. If you answer the first question in the affirmative, then did the defendant village have actual notice of such insufficiency or want of repair prior to the accident to the plaintiff? *A.* Yes. 3. If you answer the first question in the affirmative, then had such insufficiency or want of repair existed for such a length of time that the officers of the village, whose duty it was to maintain and repair such bridge,

in the exercise of ordinary care, ought to have discovered such insufficiency or want of repair in time to have remedied or repaired the same before the accident. *A*. Yes. 4. If you answer the first question in the affirmative, then was such insufficiency or want of repair the proximate cause of the plaintiff's injury. *A*. Yes. 5. Was the plaintiff, or the man Ritske, while in the act of crossing, or in attempting to cross, the bridge in question, guilty of any want of ordinary care which contributed to the plaintiff's injury? *A*. No. 6. If the plaintiff is entitled to recover, at what sum do you assess his damages? *A*. Two thousand eight hundred dollars ($2,800.00)."

A motion by the defendant for a new trial was overruled, and judgment entered upon the verdict in favor of the plaintiff, from which the defendant appeals.

*C. W. Graves,* for the appellant.

For the respondent there was a brief by *Masters & Graves,* and oral argument by *C. M. Masters.*

WINSLOW, J.  The first contention made by the appellant is that the answers to the second and third questions of the special verdict are unsupported by the evidence. We do not deem it necessary, or even profitable, to review the evidence upon these questions in this opinion. We have carefully examined it, and content ourselves with the general statement that in our opinion the evidence was entirely sufficient to support the findings of the jury.

Passing to the legal questions raised, we find the claim made that the court erred in his charge to the jury in submitting the third question. The court first instructed the jury, on this question, that the duty of highway officials to discover defects in a bridge is greater than the duty resting upon the traveler. This proposition is not complained of, but complaint is made because the court then proceeded as follows:

"Can you say, as jurors, that the care which might have been sufficient, of such officials, in discovering the sufficiency

of a bridge before the use of steam engines in this locality, would be ordinary care in discovering the sufficiency of a bridge which the law now requires shall be reasonably safe for the passage of an engine of the weight of the one here in question, when being moved or propelled in the exercise of ordinary care upon the part of the person in charge of such engine?"

We are unable to perceive any error in this instruction. The question as to what constitutes ordinary care is nearly always a relative question, depending on the surrounding circumstances and conditions. It seems to us very evident that acts which would fulfill every reasonable requirement of ordinary care in the inspection of a bridge over which nothing heavier than an ordinary loaded wagon ever passed might not constitute ordinary care when it was known that traction engines many tons in weight frequently passed over them under the sanction of express law. This is the idea contained in the instruction, and we find no error in it.

It is next claimed that the evidence shows that the plaintiff and Ritske were guilty of contributory negligence, as matter of law, because they failed to span the bridge with planks, as required by ch. 197, Laws of 1899. It was held upon the former appeal in this case (111 Wis. 113, 86 N. W. 566) that this law, which requires the bridge to be spanned "with hardwood planks at least two inches thick and twelve inches wide, so that the engine shall rest thereon in crossing," was sufficiently complied with if the tracks on which the wheels of the engine run are of the required thickness and width, though composed of narrower planks laid side by side; also, that failure to comply with the requirement is not a defense to the town, unless there is some direct causal relation between the failure and the accident. These propositions are not now combated; but it is claimed that the evidence on the present trial affirmatively shows that the bridge was not spanned with planks, even in accordance with the spirit of

the statute, as explained in the former opinion, and that it is now shown that the breakdown of the bridge was caused by the engine running off from the insufficient plank track. The bridge was twenty feet in length. The evidence on this trial seems to show conclusively that but six planks were used in spanning the bridge, being three on each side, and that two twelve-foot planks, ten inches wide, were put down end to end for the wheels on each side of the engine to travel on. These spanned the bridge completely, but did not make the tracks of the required width. Then it appears that a fourteen-foot plank, eight inches wide, was put at the side of and about midway of the two twelve-foot planks on each side, thus breaking joints, but leaving about three feet at each end of each track which was only ten inches wide. Thus it seems to appear that the statute was not complied with, even with the liberal construction given it on the former appeal. But, while this is true, a careful reading of the testimony shows that it is proven without substantial contradiction that the engine did not run off from the plank track, but that all the wheels were on the track when the bridge went down, thus demonstrating that there was no causal relation between the failure to comply with the statute and the breaking down of the bridge. All of the eyewitnesses of the accident, six in number, testify that the wheels did not run off the plank, except one, who was watching the crossing of the bridge from the window of a mill near by, and was not asked the question, but said that the engine was in the center of the bridge when the bridge went down. No witness testifies that the wheels left the plank, and the only testimony which can be claimed to point in that direction comes from certain impeaching evidence introduced by the defendant in the following manner: Ritske, the owner of the engine, who was acting as engineer at the time of the accident, after having stated that the engine did not run off the plank, was asked, on cross-examination,

if- he did not state to one Rittenhouse, after the accident, that
the wheels of the engine ran off the plank, and denied having
made such a statement.   Rittenhouse was called by the de-
fense, and testified that in the afternoon of the day of the acci--
dent he talked with Mr. Ritske, and that Ritske told him that
one wheel went off the plank, and that Ritske showed him a·
plank, lying on the south end of the bridge, which had a
mark on it of an engine wheel, which appeared to have run·
off the edge of the plank about three feet from the end.   This
conversation was introduced simply as impeaching evidence,
and was not shown to have been so closely connected with the
accident as to be a part of the *res gestæ,* and hence was not.
affirmative proof of the fact.   While the mark upon the plank
may perhaps be properly considered as affirmative evidence,
it can hardly be said to rise to the dignity of a *scintilla* of
proof that the engine ran off the plank before the breaking
of the stringer.   Of course, the engine left the plank when the·
bridge went down, and the mark so shown is just as likely to
have been made after the bridge gave way as before.   Under·
these circumstances, in view of the positive evidence of all
who observed the accident that the wheels did not leave the
plank before the accident, we cannot regard the evidence of·
the mark on the plank as sufficient to put the fact in con-
troversy.   This conclusion disposes of the claim of contribu-
tory negligence, and renders unnecessary any consideration
of the correctness of the charge of the court on this subject.

A number of pieces of decayed pine timber were offered in·
evidence on the trial as having been a part of the bridge, and
were received against objection, and this ruling is now urged
as error.   It appeared by the evidence that after the bridge
broke down, in August, 1899, the wreckage was piled in a
mill yard near by, where it remained exposed to the weather
until June, 1900, when the plaintiff's brother sawed off the·
pieces in question, and they were introduced in evidence on;

the former trial, held during that month. After that trial they were kept by plaintiff's brother in a dry dark room until the second trial of the action, in December, 1901. There was ample testimony to identify the pieces introduced in evidence as having been a part of the timbers of the broken bridge, and there was considerable testimony, by witnesses who knew the bridge and saw its timbers after the accident, to the effect that the pieces introduced in evidence appeared to be in about the same condition at the time of the trial that they were in when the bridge broke down, with the exception that they were a little more decayed. Under the circumstances, we think they were properly received in evidence. *Viellesse v. Green Bay,* 110 Wis. 160, 85 N. W. 665. The appellant relies on *Stewart v. Everts,* 76 Wis. 35, 44 N. W. 1092, where it was held to be error to allow pieces of a broken steel rail, which had been exposed to the weather for six months after the break, to be shown to the jury, in order to allow them to determine, from its appearance, whether the rail was sound when it broke. This ruling was based on the ground that persons of ordinary skill or knowledge could not draw any correct inference, from examination of the pieces, as to whether the rail was sound or not when the break took place; that the question was one for an expert. The court, however, very justly said: "It is not like the decay and rottenness of wood, the evidences of which are so clear and manifest that any person of ordinary intelligence can understand them." This language exactly fits the present case. The decay of wood is a slow and gradual process, varying somewhat according to the conditions and the nature of the wood, but quite well understood by all men of ordinary intelligence and observation. Knowing how the wood had been kept from the time the bridge broke down until the time of the trial, such men could easily arrive at an approximately correct conclusion as to its condition at the time of the accident.

The defendant requested that the following instructions be given to the jury in connection with question No. 5, but they were refused:

"The care required to be used by a traveler in passing along a highway is measured by the perils obviously to be encountered. So, in this case, knowledge of the possible insecurity of this bridge, and that the load he was purposing to put upon it was unusual in weight, will be imputed to the plaintiff. . Travelers are bound to take notice of the fact, as a matter of common knowledge, that wooden bridges spanning streams will break down in case sufficient weight is put upon them. The plaintiff could not assume, and had no right under the law to assume, that this bridge would safely bear up a traction engine weighing over 9,000 pounds, because it had for many years safely stood the test of ordinary wagon travel over it. The plaintiff in this case must have known, and the law will impute such knowledge to him, that the weight which he was proposing to put upon the bridge in question was over two or three times greater than an ordinary loaded wagon, and that the strain upon the bridge timbers would be correspondingly greater; that there was greater danger in crossing it with this engine than there would be with a loaded wagon; and so he was bound to use a greater degree of care in crossing, or attempting to cross, than he would be bound to use in case he were attempting to cross with a loaded wagon; and the degree of care which he was bound to use must be determined by you under all of the facts and testimony in the case."

The sum and substance of these proposed instructions is that the care to be demanded of the plaintiff must correspond to the known risk, and that, in crossing an ordinary country bridge with a traction engine, he must exercise a greater degree of care than he would be required to exercise if he were crossing with a loaded wagon of ordinary weight. This is doubtless correct, but we think it was fully covered by the following instruction which the court gave the jury:

"The court has further said, in reference to the crossing with this engine, that it was the duty of both these men in

charge of this engine to exercise ordinary care, and ordinary care in this case should be such as should be suitable to or commensurate with the hazard or risk which would naturally attend the circumstances of crossing this bridge; that is, it would be fair for you to say, as jurors, in finding the fact in regard to this, that they should exercise a higher degree of care and diligence, in order to constitute ordinary care, than they would be required to exercise if going over with an ordinary load of stone or an ordinary load of produce."

It is claimed that the verdict is excessive. We do not think so. The plaintiff was a vigorous and strong man. He was pinned beneath the wheels of the engine when it went down, and only rescued by raising the engine with jackscrews. His bodily injuries were severe, and one leg is crippled, so that he is still obliged to walk with a crutch or cane. There is expert testimony tending to prove that the injury is permanent. Under these circumstances, we cannot say that the sum awarded by the jury is too great.

*By the Court.*—Judgment affirmed.